Burke Wonnell
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: burke_wonnell@fd.org

*Attorney for Defendant*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      vs.<br><br>THOMAS DAVID WHOLECHEESE,<br>JR.,<br><br>            Defendant. | Case No. 4:16-cr-8 RRB<br><br>**MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)** |

COMES NOW Defendant Thomas Wholecheese, by and through undersigned counsel, and hereby respectfully submits the following motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). As amended by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons. Here, Mr. Wholecheese's history of diabetes, verified by paragraph 86 of the Presentence Report at Docket 47, combined with the novel coronavirus pandemic, provides an extraordinary and compelling basis for sentence reduction.

As courts around the country have recognized, the risk of COVID-19 to persons held in prisons is "significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." *See Basank v. Decker*, --- F. Supp. 3d ---, 2020 WL 1481503, at *3 (S.D.N.Y. March 26, 2020).[1] U.S. jails and prisons are potential hothouses for infection. Inmates live in close quarters, share bathrooms and dining halls, and often have limited access to health care. **Mr. Wholecheese is presently housed at Terminal Island FCI, a facility in which nearly 70% of the inmate population is believed to be infected with the coronavirus, the second-highest rate among federal facilities.[2]** This is no doubt a consequence of overcrowding. Inmates at Terminal Island are housed in barracks-style units where the ability to socially isolate is impractical. And with a designated capacity of 779 inmates and an actual inmate population of approximately 1,122,[3]

---

[1] See Office of the Attorney General, "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic," (March 26, 2020), available at: https://assets.documentcloud.org/documents/6820452/Memorandum-from-Attorney-General-to-BOP-re-Home.pdf

[2] San Jose Mercury News, *Nearly 70% of inmates in one California prison test positive for coronavirus as 7th inmate dies* (May 10, 2020), available https://www.mercurynews.com/2020/05/10/nearly-70-of-terminal-island-inmates-test-positive-for-coronavirus-as-7th-inmate-dies/

[3] Terminal Island Prison Rape Elimination Report (PREA), at page

Terminal Island is operating at 40% over-capacity and is
dangerously overcrowded.

As the coronavirus ravages our correctional facilities, Mr.
Wholecheese's medical problems place him in a high-risk category
if he is exposed to the coronavirus – if he hasn't already been
exposed.  Because the conditions of confinement at BOP
facilities – and Terminal Island in particular – greatly
increase his risk of exposure, Mr. Wholecheese can establish
"extraordinary and compelling" reasons justifying a reduction in
sentence.  Mr. Wholecheese asks that the Court modify his 84-
month sentence to permit him to serve the remainder of his
sentence in home confinement.

Such a modification will effectively allow Mr. Wholecheese
to finish the remaining portion of his prison sentence in a
location which will allow him to protect himself and others from
the spread of COVID-19 by sheltering in place at a residence
which allows for social distancing.

It is unclear from the attached letter whether or not Mr.
Wholecheese has filed the appropriate application requesting

---

2. Available at:
https://www.bop.gov/locations/institutions/trm/prea_trm.pdf.  The
current Terminal Island web site lists a current inmate
population of 1084.  See
https://www.bop.gov/locations/institutions/trm/

compassionate release or when.  If he has, it's unclear whether
30 days have passed from the date the application was submitted.
However, this Court may find that the administrative exhaustion
requirement is excused.  Administrative exhaustion under 3582(c)
is not jurisdictional and is instead a claims-processing rule
that may be excused for equitable reasons such as futility and
the risk of irreparable harm.  Mr. Wholecheese may be able to
establish both.  In any event, there is no time to waste.

## I.  BACKGROUND

On November 10, 2016, this court sentenced Mr. Wholecheese
to serve 84 months' imprisonment and three years' supervised
release in connection with his guilty plea to felon in
possession.  Mr. Wholecheese remains incarcerated at Terminal
Island, a minimum-security facility that has one of the highest
rates of coronavirus infections among BOP facilities.[4]  The
facility has placed all inmates in quarantine status, meaning
that his ability to call or otherwise communicate with the
undersigned's office has been disrupted.  While lack of inmate

---

[4] *See Order Granting Reduction in Sentence*, <u>United States v.</u>
<u>Duane Fields</u>, Case No. 3:12-cr-0022-HRH, Doc. 223 at 10 (D. AK.
May 6, 2020) (citing Richard Winton, Terminal Island Prison
Inmates have Worst Coronavirus Outbreak in Federal System, Los
Angeles Times (Apr. 29, 2020),
http://www.latimes.com/california/story/2020-04-29/coronavirus-
terminal-islandprison-inmates-outbreak.html).

access to phones at Terminal Island has been disputed by the
government in recent filings, undersigned counsel is unaware at
this time of anybody getting a call from that facility since
Wholecheese sent his letter.

As Mr. Wholecheese explains in the attached letter,
conditions are grim at Terminal Island and he is concerned for
his life and those of the others he is detained with.  Mr.
Wholecheese has served approximately four years of his seven
year sentence.  Counting good time credits earned, and without
any information related to whether or not he has earned
additional time off due to the First Step Act, Mr. Wholecheese
has completed well over half of his sentence.

## II.  STATUTORY AUTHORITY

Title 18, United States Code § 3852(c)(1)(A)(i) allows a
court to reduce an inmate's sentence if the court finds that (1)
"extraordinary and compelling reasons" warrant a reduction, (2)
the reduction would be "consistent with any applicable policy
statements issued by the Sentencing Commission," and (3) the
applicable sentencing factors under § 3553(a) warrant a
reduction.

Congress has not defined the term "extraordinary and
compelling," but the Sentencing Commission ("Commission") has

issued a policy statement defining the term. The policy statement lists three specific examples of "extraordinary and compelling reasons," none of which apply to Mr. Wholecheese.

The policy statement also provides a fourth "catchall" provision if the Director of the Bureau of Prisons determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." Id. § 1B1.13, cmt. n.1(D).

### III.  ARGUMENT

**A. The court has the authority to consider Mr. Wholecheese's motion because the pressing health emergency excuses exhaustion of administrative remedies.**

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons (BOP), Congress expanded the statute in the First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018).  As amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

Although it is unclear whether Mr. Wholecheese has submitted a request to the warden, this Court may excuse compliance with the normal 30-day timing rule in light of the documented and serious national emergency.

Congress initially tasked the Bureau of Prisons with bringing "extraordinary and compelling" cases to the attention of the district court for adjudication. But the BOP proved unfit for the task. Between 2013 and 2017, the Bureau of Prisons approved just six percent of the 5,400 applications it received, and 266 inmates who requested compassionate release died in custody before the sentencing judge was given an opportunity to weigh in. In a key report on the BOP's administration of compassionate release—a report that helped spur the First Step Act's reforms to compassionate release—the Department of Justice's Office of Inspector General explained that the BOP's management of compassionate release prevented many inmates "who may be eligible candidates for release" from even being considered and left "terminally ill inmates dying before their requests were decided."[5]

To restore compassionate release to its intended role—a mechanism for empowering judges to consider sentencing

---

[5] Available https://oig.justice.gov/reports/2013/e1306.pdf.

reductions in appropriate cases—Congress enacted section 603 of
the First Step Act.  The First Step Act loosened the BOP's grip
on the pipeline of cases presented to the district court by
permitting inmates to petition courts directly.  It still gave
the BOP a role to play; BOP would get 30 days in which to
investigate a compassionate release request and make an
administrative decision or refer the case to the court.  But the
message from Congress to the BOP was clear: triage compassionate
release claims quickly, or be cut out of the process entirely.

In ordinary times, in most cases, Congress would have seen
30 days (14 days in the case of terminally ill inmates) as an
adequate compromise between the facility's need to conduct its
investigation and an inmate's needs for a prompt determination.
These, however, are not ordinary times. A 30-day wait is
intolerable for a disease that can go from asymptomatic to fatal
in less than a week.[6]  Under Section 3582, BOP is a claims
processor with a 30-day right-of-first refusal on these motions.
However, the exhaustion requirement is not jurisdictional.  The

---

[6] Cassidy McDonald, *Federal Prisons Confirm First Staff Death Linked to Coronavirus*, CBS News (Apr. 18, 2020) (describing USP Atlanta employee who died of COVID-19, who was tested by the BOP, found asymptomatic, and cleared for entry to the facility less than a week earlier), available at: https://www.cbsnews.com/news/coronavirus-federal-prisons-confirm-first-staff-death-linked-to-covid-19-robin-grubbs-usp-atlanta/

Supreme Court not only recognizes the difference between claims-processing rules and jurisdictional requirements but "has emphasized the necessity of observing [that] important distinction" and "warding off profligate use of the term 'jurisdiction.'" *United States. v. Haney*, __ F. Supp. 3d __, 2020 WL 1821988, at *2 (S.D.N.Y. 2020) (citing *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)). Luckily, there is a "bright line test": "***only*** if Congress has clearly stated that the rule is jurisdictional" is the rule jurisdictional — "absent such a clear statement" restrictions are "non-jurisdictional." Id. (citing *Auburn Reg'l*, 568 U.S. at 153) (emphasis added).

The analysis is simple: Section 3582 contains no clear statement that exhaustion is jurisdictional. Id.[7] Without that statement, the exhaustion requirement "is a claim-processing rule." Id. at *3. And DOJ has agreed in other cases. *See United States v. Gentille*, 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9,

---

[7] *Haney*, 2020 WL 1821988, at *2-3 ("Tellingly, the word 'jurisdiction' . . . never appears."). Similarly, courts have found that § 3582(c)(2) contains no jurisdictional bar. *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1245-47 (11th Cir. 2017); *United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017); *United States v. Beard*, 745 F.3d 288, 291-92 (7th Cir. 2014); *United States v. Trujillo*, 713 F.3d 1003, 1006-08 (9th Cir. 2013); *United States v. Weatherspoon*, 696 F.3d 416, 421-22 (3d Cir. 2012).

2020) (government concedes exhaustion "is not jurisdictional, but rather is a claims-processing rule").

Moreover, "[e]ven where exhaustion is seemingly mandated by statute, . . . the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (citing *McCarthy v. Madigan*, 503 U.S. 140, 146-47 (1992)). "First, exhaustion may be unnecessary where it would be futile, either because agency decision-makers are biased or because the agency has already determined the issue." Id. Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." *Id.* at 119. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Id.*

"Section 3582(c) is a distinctive federal statute." *United States v. Russo*, 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020). Because it is a remedial statute intended to correct BOP's mismanagement of the compassionate release process and because it permits a defendant to move for compassionate release after 30 days, no matter where the BOP is in its administrative review-it is uniquely appropriate for this Court to read judicially-crafted futility and emergency exceptions into the statute. As numerous district courts considering compassionate release applications brought by vulnerable defendants have

concluded, the exhaustion may be excused where resort to such remedies would be futile or result in irreparable harm. *See United State v. Perez*, -- F. Supp. 3d --, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (citations omitted). (excusing exhaustion for defendant's compassionate release motion based on futility and risk of prejudice). That is the case here.

## 1. Waiting is futile.

The Court should excuse exhaustion because BOP has predetermined the issue—it will not file a motion on Mr. Wholecheese's behalf because the BOP does not recognize an inmate's risk of death because of COVID-19 to be grounds for compassionate release. *See Sun v. Ashcroft*, 370 F.3d 932, 942 (9th Cir. 2004) (futile where "the agency's position on the question at issue appears already set, and it is very likely what the result of recourse to administrative remedies would be").[8]

---

[8] See also Jasperson v. Bur. of Prisons, 460 F. Supp. 2d 76, 88 (D.D.C. 2006) (court "may excuse exhaustion" where "resort to administrative remedies would be clearly useless" or there exists "adequate certainty of an adverse response") (quoting Commc'ns Workers of Am. v. AT&T, 40 F.3d 426, 432 (D.C. Cir. 1994), Randolph-Sheppard Vendors of Am. v. Weinberger, 795 F.2d 90, 105 (D.C. Cir. 1986)); Knish v. Stine, 347 F. Supp. 2d 682, 686 (D. Minn. 2004) (futile to exhaust BOP procedures where "the administrative body has predetermined the issue before it") (citing Gibson v. Berryhill, 411 U.S. 564, 575 n. 14 (1973)).

The BOP's criteria for a sentence reduction are no mystery: they are published in Program Statement 5050.50.[9]  And Mr. Wholecheese fits none of them.  The BOP's policy predetermines that it will not file a sentence-reduction motion on Mr. Wholecheese's behalf.  Further, despite the fact that people from all quarters – including a bipartisan group of senators, see Exhibit D-2 – have begged the BOP to update its compassionate release criteria to include vulnerability to COVID-19, it has refused to do so.  The BOP will never recommend Mr. Wholecheese's release.

**2. Waiting unduly prejudices Mr. Wholecheese and prevents relief.**

The Court should be able to adjudicate Mr. Wholecheese's COVID-19 claim before the 30-day period has passed, because any additional delay increases the risk Mr. Wholecheese is infected and suffers dire consequences.  "If it takes two weeks to exhaust a complaint that the complainant is in danger of being killed tomorrow, there is no 'possibility of some relief' and so nothing for the prisoner to exhaust." *See Fletcher v. Menard Corr. Cntr.*, 623 F.3d 1171, 1174 (7th Cir. 2010).

---

[9] *See* Bur. of Prisons, *Compassionate Release / Reduction in Sentence: Procedures for Implementation* (Jan. 17, 2019) (available at: https://bit.ly/2Xmss4m).

This is no idle concern. Inmates are catching the virus and dying while these motions are litigated. On April 1st, a district court in Northern Florida commuted a life sentence for a defendant named Andre Williams to time-served with 12-months home confinement, finding age and medical conditions created significant risk of "life threatening illness should he be exposed to COVID-19 while incarcerated." *United States. v. Williams*, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020) (ECF No. 91). Before the order granting release was filed, Mr. Williams caught coronavirus in FMC Butner. He died April 12th.

As the Ninth Circuit has said, courts may "dispense with the [exhaustion] rule in rare cases where exceptional circumstances of peculiar urgency" exist. *Hendricks v. Zenon*, 993 F.2d 664, 672. (9th Cir. 1993). These are urgent circumstances.

**B. This Court is empowered to determine what constitutes "extraordinary and compelling" circumstances to justify a reduction in sentence.**

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of

Case 4:16-cr-00008-RRB   Document 60   Filed 05/22/20   Page 13 of 32

"extraordinary and compelling reasons" only in the application
notes.  The examples generally fall into four categories based
on a defendant's (1) terminal illness, (2) debilitating physical
or mental health condition, (3) advanced age and deteriorating
health combined with the amount of time served, or (4)
compelling family circumstances. U.S.S.G. § 1B1.13 comment.
n.1(A)-(C).  The commentary also includes a fifth catch-all
provision for "extraordinary and compelling reason other than,
or in combination with, the reasons described in subdivisions
(A) through (C)" as determined by the Director of the Bureau of
Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

      However, the policy statement was last amended in November
2018, before the First Step Act was passed, and it still
requires a motion filed by the BOP.  The First Step Act,
however, "significantly altered the landscape of compassionate-
release motions." *United States v. Rodriguez*, 2020 WL 1627331,
at *4 (E.D. Pa. Apr. 1, 2020).

      Because the Commission has not updated its policy statement
to account for the changes imposed by the First Step Act, the
policy statement is now clearly outdated. For that reason, a
majority of district courts around the country have ruled that,
in the absence of applicable policy statements, courts "can
determine whether any extraordinary and compelling reasons other

Case 4:16-cr-00008-RRB   Document 60   Filed 05/22/20   Page 14 of 32

than those delineated in [U.S.S.G. § 1B1.13] warrant" sentence modification. *United States v. Brown*, -- F.Supp.3d --, 2019 WL 4942051, at *2 (S.D. Iowa Oct. 8, 2019).

These courts have held that the First Step Act's amendments demonstrate that the existing policy statement no longer "complie[s] with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under Section 3582." *United States v. Cantu*, -- F. Supp. 3d --, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (publication forthcoming).

Further, because Congress enabled incarcerated persons to file "direct motions to district courts" for sentence modification in part to "increase the use of compassionate release," the "only way" to give force to that command "is to allow district judges to consider the vast variety of circumstances that may constitute 'extraordinary and compelling.'" *Brown*, 411 F. Supp. 3d at 451; *Redd*, 2020 WL 1248493, at *7 (citing cases). In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance."

Though the BOP's criteria leave it little room to move for a reduction based on COVID-19 vulnerability, a number of courts have also concluded that releasing inmates who are especially vulnerable to coronavirus is consistent with the criteria in U.S.S.G. § 1B1.13.  Those orders that weigh COVID-19 vulnerability in the compassionate-release calculus include *Miller v. United States*, 2020 WL 1814084, at *1,4 (E.D. Mich. Apr. 9, 2020); *United States v. Colvin*, 2020 WL 1613943, at *3-4 (D. Conn. Apr. 2, 2020); *United States v. Resnick*, 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020); *United States v. Gonzalez*, 2020 WL 1536155, at *2-3 (E.D. Wash. Mar. 31, 2020); *United States v. Muniz*, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020); *United States v. Campagna*, 2020 WL 1489829, at *1, 2 (S.D.N.Y. Mar. 27, 2020).

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment, they have held that judges have authority based on the catch-all provision in Application Note 1(D) which implicitly recognizes that other "compelling reasons" could exist aside from what is listed.  *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that § 1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, --- F.

Supp. 3d ----, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019)
("Read as a whole, the application notes suggest a flexible
approach ... [and] recognize that the examples listed in the
application note do not capture all extraordinary and compelling
circumstances.").

The Government conceded this point in *United States v.
Young*, agreeing that "the dependence on the BOP to determine the
existence of an extraordinary and compelling reason, like the
requirement for a motion by the BOP Director, is a relic of the
prior procedure that is inconsistent with the amendments
implemented by the First Step Act." *United States v. Young*, 2020
WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020).  The court in *Young*
followed the majority of district courts in recognizing that
§ 1B1.13's defined categories are not exclusive: "In short,
federal judges are no longer constrained by the BOP Director's
determination of what constitutes extraordinary and compelling
reasons for a sentence reduction." *Id.*[10] *See also United States*

---

[10] *See also United States v. O'Bryan*, 2020 WL 869475, at *2 (D.
Kan. Feb. 21, 2020); *United States v. Maumau*, 2020 WL 806121, at
*2-3 (D. Utah Feb. 18, 2020) ("[A] majority of district courts to
consider the question have embraced Mr. Maumau's position" that
limiting the catch-all provision to circumstances identified by
the BOP is inconsistent with the law) (citing ten other cases);
*Brown*, 411 F. Supp. 3d at 451 ("[I]f the [First Step Act] is to
increase the use of compassionate release, the most natural reading
of the amended § 3582(c) and § 994(t) is that the district court
assumes the same discretion as the BOP Director when it considers

*v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

Here, this Court has discretion to assess whether Mr. Wholecheese's case presents "extraordinary and compelling reasons" for his release, regardless whether they fall within or outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the old policy statement.

**C.  COVID-19 is an unprecedented and rapidly-expanding global health emergency that presents a serious risk to vulnerable prisoners.**

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic.[11]  COVID-19 is a serious disease that makes

---

a compassionate release motion properly before it. . . . Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted)); *United States v. Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

[11] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.

certain populations of people severely ill and can lead to death.  About 20% of COVID-19 patients require hospitalization, about 10 times more than the percentage of patients with the flu.[12]  It is estimated to kill at least 10 people per thousand infected, making it ten times more lethal than the seasonal flu. *Id*.[13]  On March 26, 2020, the United States became the global leader in COVID infections.[14]

As of May 19, 2020, COVID-19 has infected almost 5 million people worldwide, leading to over 320,000 deaths. *Coronavirus COVID-19 Global Cases*, Center for Systems Science and Engineering (CSSE) at Johns Hopkins University, https://coronavirus.jhu.edu/map.html (updating regularly).  The severity of the coronavirus pandemic is reflected in the actions of local and national leaders, who have taken drastic measures to prevent the spread of the disease.  All 50 states and the national government have

---

[12] Pien Huang, How The Novel Coronavirus And The Flu Are Alike ... And Different, *www.npr.org* (Mar. 20, 2020) at https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different.
[13] *See also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID Journal (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.
[14] Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, Business Insider (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3.

declared states of emergency.[15]  Additionally, more than half of
the states and the District of Columbia have imposed severe
"lockdown" rules.  While some of these public restrictions are
now being lifted, as in our District, the infections are just
starting to sprout in our jails and will continue to circulate
in BOP facilities due to conditions fostering their spread.

It is widely agreed that conditions of imprisonment create
the ideal environment for the transmission of contagious
diseases.[16]  As the Centers for Disease Control has stressed,
"incarcerated/detained persons live, work, eat, study, and
recreate within congregate environments, heightening the
potential for COVID-19 to spread once introduced."[17] The CDC

---

[15] *See Proclamation on Declaring a National Emergency Concerning
the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13,
2020), https://www.whitehouse.gov/presidential-
actions/proclamation-declaring-national-emergency-concerning-
novel-coronavirus-disease-covid-19-outbreak/. Kamran Rahman &
Alice Miranda Ollstein, *How States Are Responding to
Coronavirus, in 7 Maps*, POLITICO (Mar. 24, 2020),
https://www.politico.com/news/2020/03/24/coronavirus-state-
response-maps-146144.
[16] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45
CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007),
https://doi.org/10.1086/521910.
[17] Centers for Disease Control and Prevention (CDC), *Interim
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in
Correctional and Detention Facilities* (Mar. 23, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/community/correction-
detention/guidance-correctional-detention.html

Case 4:16-cr-00008-RRB   Document 60   Filed 05/22/20   Page 20 of 32

recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id.*

On March 21, 2020—approximately two months ago—the BOP announced its first reported inmate case of COVID-19. As of May 11, 2019, the BOP reported 3,379 positive cases of COVID-19 among inmates, and 250 among staff. At least 49 inmates had died as of that date, and at least one BOP staff member.

The president of a correctional officers' union estimates inmate infection at 600% of BOP's public number.[18] One BOP employee told news reporters that "the Bureau is playing with these numbers … if they don't test 'em and they don't get confirmed they don't have to be reported."[19] This seems to

---

[18] Staff report, *Elkton union president reports different COVID-19 stats than Federal Bureau of Prisons*, WKBN News, Lisbon Ohio (Apr. 9, 2020) (available at: https://bit.ly/2VtyPAv).

[19] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission*,*'* The Lens (Mar. 31, 2020) (available at:

comport with the BOP attitude observed by Mr. Wholecheese's
letter at ground zero.

It's not that BOP hasn't taken any measures to attempt to
control the spread.  All inmates have been generally locked
down since March 31, 2020, and BOP has mandated certain
cleaning measures and issuance of protective gear.  But those
measures simply haven't flattened the curve for those inside
the institutions' walls.  Despite BOP's efforts, coronavirus
continues to spread, putting prisoners, staff, and the
communities that surround BOP facilities in greater and greater
danger.

**1.  The conditions of confinement at federal correctional
facilities prevent control of COVID-19.**

The coronavirus responsible for COVID-19 is incredibly
infectious.  It survives "on surfaces for days."[20]  But its real
danger is described in a single word: aerosol.  Unlike many
diseases, "the virus can remain viable and infectious in
aerosols for hours" — just breathing will spread the virus, no
cough or sneeze required.[21]  In a study soon-to-be-published in a
Centers for Disease Control journal, researchers confirmed what

---

https://bit.ly/34Az7tf).
[20] Mary Van Beusekom, *U.S. studies offer clues to COVID-19 swift
spread, severity*, Cntr. for Infectious Disease Research & Policy
(Mar. 18, 2020) (available at: https://bit.ly/3b9fk70).
[21] *See id.*

was already suspected: "SARS-CoV-2 aerosol was detected" in air samples taken in hospital ICUs and general wards up to four meters from infected patients.[22] And that result is echoed by the National Academy of Sciences. In a letter dated April 1st, Dr. Harvey Fineberg, Chair of the National Academy of Medicine's committee on emerging infectious disease, reported that all available studies were showing "aerosolization of [the] virus from normal breathing."[23] He noted how seemingly slight movements can stir up the virus into the air: simply the "doffing of PPE [personal protective equipment], the cleaning of floors, or the movement of staff" may be enough to re-suspend "virus-laden aerosol."[24] Only the 1918 Spanish Flu is thought to be more infectious.[25]

Prison officials are powerless to reduce breathing, coughing, sneezing, or movement in the cramped, shared spaces of

---

[22] Guo Zhen-Dong, et al., "Aerosol and surface distribution of severe acute respiratory syndrome coronavirus 2 in hospital wards, Wuhan, China," Emerging Infectious Disease (July 2020) (available at: https://bit.ly/2xqvx98) (peer-reviewed journal published by the Centers for Disease Control). The study found that even in hospitals, the "virus was widely distributed on floors, computer mice, trash cans, and sickbed handrails." Id.
[23] Letter from Dr. Harvey Fineberg, Nat'l Acad. of Med., to Kelvin Droegemeier, Ph.D., Office of the President (Apr. 1, 2020) (available at: https://bit.ly/3b5aUhb).
[24] Id. at 2.
[25] Exhibit D-1 (Beyrer Decl.) at ¶ 10 (each carrier is estimated to infect 3 others on average).

prisons—the phone blocks, the showers, the legal libraries. Just as it spreads easily in the most controlled environments, hospitals, the virus spreads easily in the least prepared, prisons.

Apart from the questionable numbers, BOP fails to consistently follow its own policies. Staff who should be quarantined after exposure aren't.[26] Prisons are failing to stock basic essentials like soap.[27] The situation is so poor that a union representing 30,000 BOP employees has filed an OSHA complaint because "staff who were screened and ordered home" based on the screening tool shown above were "ordered back to work within 48 hours."[28]

Even in BOP's most critical facilities, they are powerless to stop the contagion. Recently, the Government opposed a release motion for an inmate in FCI Butner, citing screening,

---

[26] Joseph Neff & Keri Blakinger, *Federal Prisons Agency 'Put Staff in Harm's Way' of Coronavirus*, The Marshall Project (Apr. 3, 2020) (available at: https://bit.ly/2VkWuTC).

[27] *See* Letter from Jerrold Nadler, Chair, House Judiciary Comm., to William Barr, Att. Gen., at 1 (Apr. 10, 2020) ("Reports from inside the Oakdale facility indicate that there is a continuing lack of availability of personal hygiene products and that general sanitation is lacking.") (citing Sadie Gurman et al., *Coronavirus Puts Prison Under Siege*, Wall Street Journal (Apr. 6, 2020) (available at: https://on.wsj.com/3a4TD6K).

[28] *See* Lia Russell, *Union warns of coronavirus exposure in federal prisons, VA facilities*, FCW (Apr. 7, 2020) (available at: https://bit.ly/3a5r3C9).

visitation lockdown, social distancing, and other BOP pandemic

policies (similar to arguments raised in this District in

several recent bail hearings).[29]  On March 24th, Butner had its

first reported case (similar to ACC this week). By April 14th,

four inmates were dead.  Forty-five were confirmed infected.

Another 25 staff were infected.[30]

   In short, the virus continues to spread, and despite the

efforts of BOP officials, the agency is ill-equipped to confront

one of the most infectious and deadly diseases of the last

century.

   **2.  Mr. Wholecheese runs a high risk of serious illness or**
       **death if he contracts COVID-19.**

   The CDC and other medical authorities have clarified that

COVID-19 is especially dangerous for both older people and

people with severe chronic medical conditions.[31]  Eight out ten

deaths reported in the United States have been in older adults.

*Id.*  Those with certain serious health concerns—including

chronic lung disease, moderate to severe asthma, compromised

immune systems, severe obesity, diabetes, renal failure, and

---

[29] United States v. Rumley, 08-cr-5 (W.D. Va., April 3, 2020) (ECF
No. 185 at 4-7).
[30]    Bur.    of    Prisons,    "COVID-19"    (available    at:
https://www.bop.gov/coronavirus/) (last visited: Apr. 14, 2020).
[31] *See* CDC, *Older Adults* (Mar. 21, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-
risk-complications/older-adults.html.

liver disease—are also especially vulnerable to and at higher
risk for serious complications from COVID-19, including death.[32]

Mr. Wholecheese has documented diabetes, which may be why
he was detained at Terminal Island in the first place. We are
learning more disturbing facts about this pathogen daily. In
fact, the CDC recently reported that, of those COVID-19 patients
hospitalized who had underlying conditions, 50 percent had
hypertension.[33] Moreover, the World Health Organization has
identified hypertension as *the* leading risk factor.[34]

The first large study (over 5,000 patients) of
hospitalized COVID-19 patients published in the Journal of the
American Medical Association, researchers found that among
hospitalized patients, 57% suffered from hypertension – the most
dominant co-morbidity compared to obesity, or diabetes.[35] As an

---

[32] *See* CDC, *Information for Healthcare Professionals: COVID-19 and Underlying Conditions* (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html.

[33] Shikha Garg et al, Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1-30, 2020, CDC (Apr. 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.

[34] WHO, Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19) at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[35] JOURNAL OF AMERICAN MEDICAL ASSOCIATION, Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area (April 22, 2020). Available here: https://jamanetwork.com/journals/jama/fullarticle/2765184.

incarcerated person with a primary comorbidity, in a facility
where the disease is running rampant, and in which it is
impossible for him to follow the CDC's recommendations to
protect himself from exposure to this highly-transmissible
disease, Mr. Wholecheese is mortal danger while he remains at
Terminal Island.

This risk of serious illness or death from the
unprecedented global pandemic, together with all of the other
relevant factors in this case, presents an extraordinary and
compelling basis for sentence reduction.

**3. Courts responding to the Coronavirus pandemic have
recognized the critical importance of reducing incarcerated
populations.**

The federal judiciary's response to COVID-19 reflects the
extreme exigency of the present circumstances, especially for
those individuals most vulnerable to harm from the virus. Based
on the epidemic, district courts have granted various forms of
relief, including compassionate release in an effort to "flatten
the curve". *See United States v. Marin*, No. 15-cr-252, Dkt. No.
1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his
motion, including his advanced age, significantly deteriorating
health, elevated risk of dire health consequences due to the
current COVID-19 outbreak, status as a non-violent offender, and
service of 80% of his original sentence.").

In *United States v. Garlock*, for example, the district court extended the defendant's date for surrendering to serve an already-imposed prison sentence until September 1, 2020, concluding that no one should be entering BOP custody absent "truly extraordinary circumstances":

> By now it almost goes without saying that we should
> not be adding to the prison population during the
> COVID-19 pandemic if it can be avoided. Several recent
> court rulings have explained the health risks—to
> inmates, guards, and the community at large—created by
> large prison populations. . . The chaos has already
> begun inside federal prisons—inmates and prison
> employees are starting to test positive for the virus,
> quarantines are being instituted, visits from
> outsiders have been suspended, and inmate movement is
> being restricted even more than usual. . . . To avoid
> adding to the chaos and creating unnecessary health
> risks, offenders who are on release and scheduled to
> surrender to the Bureau of Prisons in the coming
> months should, absent truly extraordinary
> circumstances, have their surrender dates extended
> until this public health crisis has passed.

2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020).

In *United States v. Copeland*, the Court granted a sentence reduction to time served under Section 404(b) of the First Step Act to a defendant serving a life sentence for a drug trafficking conspiracy and firearm possession. No. 2:05-cr-00135-DCN (D.S.C. Mar. 24, 2020) (ECF No. 662). The court recognized that the defendant's "tenuous health condition" put him at "even higher risk for severe illness and possible death" from the COVID-19 pandemic. Id. at 7. The court considered

Case 4:16-cr-00008-RRB   Document 60   Filed 05/22/20   Page 28 of 32

letters from members of Congress as evidence of its "desire for courts to 'use all available powers and authorities . . . to reduce the number of federal prisoners in . . . prisons,'" especially for elderly and sick individuals and those within the last 36 months of their sentences who are appropriate for placement in home confinement. Id. (quoting Letter of House Judiciary Committee, Mar. 19, 2020).

A sampling of the court orders granting release based on the pandemic fails to convey the full volume of building precedent. See, e.g., United States v. Kennedy, 2020 WL 1493481, at *1 (E.D. Mich. Mar. 27, 2020) ("[T]he danger posed to Defendant in the Saginaw County Jail by the COVID-19 pandemic constitutes an independent compelling reason to temporarily release him from custody."); United States v. Michaels, 2020 WL 1482553, at *1 (C.D. Cal. Mar. 26, 2020 ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)); United States v. Jaffee, No. 19-cr-00088-RDM (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"); United States v. Harris, No. 19-cr-00356-RDM (D.D.C. Mar. 26, 2020), ECF No. 35 ("The Court is

convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Perez*, 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should [h]e contract COVID-19"); *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, __ F. Supp. 3d __, at *2 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

> **4. Mr. Wholecheese will not be a danger to the community if he is released, and a sentence of time served constitutes a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).

Here, Mr. Wholecheese has served over half his sentence. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a). The overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic

and the serious risk it presents. Although the circumstances of the present offense qualified Mr. Wholecheese for the serious sentence this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions). The § 3553(a) factors can be met in this case by an order of home confinement for the balance of his term as a condition of supervised release.

Of further relevance is the use to which Mr. Wholecheese has put his time while serving his sentence. His letter reflects somebody who, like many who enter their forties, seems to be finally figuring it out. The totality of circumstances demonstrate that permitting Mr. Wholecheese to serve the balance of his sentence in home confinement is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a). This Court should issue a presentence report

supplement to determine whether Mr. Wholecheese has appropriate

housing for placement on home confinement if the court considers

that necessary to ensure the protection of the public.

DATED at Anchorage, Alaska this 22nd day of May, 2020.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Burke Wonnell*
Burke Wonnell
Assistant Federal Defender

Certificate of Service:
I hereby certify that I
electronically filed the
foregoing and any attachments
with the Clerk of Court for the
United States District Court for
the District of Alaska by using
the district's CM/ECF system on
May 22, 2020. All participants
in this case are registered
CM/ECF users and will be served
by the district's CM/ECF system.
*/s/    Burke Wonnell*

Case 4:16-cr-00008-RRB   Document 60   Filed 05/22/20   Page 32 of 32